**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Raymond K. Toy and Linda S. Toy, husband and wife,<br><br>    Plaintiffs,<br><br>vs.<br><br>International Business Machines, a corporation; Dennis Grosser and Jane Doe Grosser, husband and wife<br><br>    Defendants.<br>_____<br>International Business Machines Corporation, a corporation,<br><br>    Defendant/Counterclaimant,<br><br>v.<br><br>Raymond K. Toy and Linda S. Toy, husband and wife,<br><br>    Plaintiffs/Counterdefendants. | No. CIV 03-0860-PCT-DKD<br><br>**ORDER** |

    Pending before this Court are Defendants'[1] separate Motions for Summary Judgment. With respect to Plaintiffs' individual claims against them, Defendants Grosser filed a Motion for Summary Judgment on January 14, 2005 (Doc. #78), and Defendant IBM filed a Motion for Summary Judgment on January 18, 2005 (Doc. #80). For the reasons stated below, the Court

---

[1] International Business Machines ("IBM"), Dennis and Donna Grosser ("Grosser").

finds there is no genuine issue of material fact, and that Defendant IBM is entitled to judgment as a matter of law. Grosser's Motion for Summary Judgment will be considered in a separate order. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) (Doc. #5).

## BACKGROUND

Plaintiff Raymond Toy's (hereinafter "Toy") employment with Defendant IBM (hereinafter "IBM") began on April 26, 1978 and ended upon his termination on June 4, 2002 (Doc. #2 at 2, ¶4). Toy alleges that IBM discriminated against him on the basis of his age (age 43 at the time of termination) and thus improperly terminated his employment with IBM (Count 1). Toy also claims that Defendant Grosser's intentionally interfered with Toy's employment contract with IBM. Toy alleges that Grosser's intentional interference occurred when Grosser contacted IBM over a matter which subsequently led to an internal investigation of Toy's conduct, and eventually resulted in Toy's termination (Count 2).

IBM alleges that it did not discriminate against Toy on the basis of age and that its decision to terminate Toy was a legitimate one because it was based on the honest and good faith belief that Toy violated the IBM Business Conduct Guidelines ("the Guidelines"), specifically section 5.1.2, entitled "Competing Against IBM."

Plaintiff began working for Defendant IBM on or about April 26, 1978. At the time of his termination on June 4, 2002, Plaintiff was a Field Manager in the Printing Systems Division, earning an annual salary of roughly $85,000.00. At all times during his employment, Plaintiff was subject to IBM's Guidelines as are all IBM employees (Doc. #81, ¶5, 6 ). At the time of Plaintiff's employment with IBM, the pertinent sections of the Guidelines read,

> "[o]bviously, you may not commercially market products or services in competition with IBM's current or potential product offerings. Such activities are 'commercial' if you receive direct or indirect remuneration of any kind... .[It is] your responsibility to consult with your management or IBM counsel to determine whether your planned activity will compete with any of IBM's actual or potential businesses. This should be done before you pursue any activity that might create a conflict of interest with IBM." (BCG Section 5.1.2).

- 2 -

In April of 2000, Toy started a business named Colorado River Communications ("CRC") with other family members, to generate an additional source of income (Doc. #85 at 2). According to the files listed with the Arizona Secretary of State and the Arizona Corporation Commission, Toy is listed as the President of CRC and his wife Linda Toy as the CEO (Doc. #81, ¶10). CRC's letterhead contains a caption which reads that CRC performs residential and commercial "Voice/Data/Fiber Cabling" (Doc. #80 at 4). In March or April of 2000, Toy informed Mike Solan, his supervisor at the time, that he was involved with CRC in name only and that CRC wired "new houses for computers." Solan believed that CRC was involved only in residential cabling based on Toy's description of CRC, and therefore Solan did not perceive the residential wiring to be a conflict of interest (Doc. #81, ¶35). Mr. Solan is the only management representative who was consulted about CRC during Toy's employment with IBM (Doc. #81, ¶28).

In April 2002, Grosser, a retired IBM employee, telephoned IBM and told IBM that Toy was running CRC, a cabling business, and that the business could be in competition with IBM (Doc. #81, ¶2). Because Grosser was employed at Havasu Regional Medical Center ("HRMC") and at the time his supervisor was Plaintiff Linda Toy, Grosser asked that his name be kept confidential (Doc.#81, ¶3). Due to poor work performance, Grosser was terminated on May 2, 2002 (Doc. #88, ¶2).

Following Grosser's call to IBM, Tommy Reed, an IBM investigator, began an internal investigation regarding the information provided about Toy, focusing on whether or not Toy had violated section 5.1.2 of the Guidelines (Doc.# 81, ¶4). Reed learned that IBM had solicited work from HRMC which declined the solicitation because HRMC was being serviced by CRC instead. (Doc. #81, ¶¶8, 9). On May 2, 2002, Grosser sent Reed a document related to the sale of CISCO equipment and a copy of a proposal letter dated March 11, 2002; the letter was addressed to Linda Toy, HRMC's Director of Information Services, and signed by Toy, who was identified as CRC's President.

1    As part of his internal investigation, Reed interviewed Toy on May 14, 2002 in Boulder.
2 Also present at the meeting was John Latimer, IBM's Manager of Security at the Boulder site.
3 (Doc. #81, ¶14). Upon questioning, Toy initially denied his involvement with CRC but later
4 admitted to signing bids on behalf of CRC after Mr. Reed showed Toy a copy of a March 11,
5 2002 proposal letter on which Toy's signature appeared. (Doc. #81, ¶15). At this meeting, Toy
6 stated that he had not mentioned the existence of CRC to any management representative (Doc.
7 #81, ¶16). Toy was told that he could provide any additional information or documents if he
8 wished to do so, and was afforded the opportunity to ask questions before the interview
9 concluded. IBM did not receive any additional information from Toy (Doc. #81, ¶17). At the
10 end of the investigation, Reed and his supervisor, Vira Brock, prepared a report based upon the
11 information the investigation had revealed, and concluded that Toy's company, CRC, was in the
12 cabling business, it was in direct competition with IBM, and Toy had thus violated IBM's
13 Guidelines (Doc. #81, ¶19).
14    On June 5, 2002, Toy was told by his first-line manager, Dan Crecco, that he was being
15 terminated for violating the Guidelines, but that Toy could appeal the termination decision (Doc.
16 #81, ¶26). Toy never raised the issue of age discrimination during his Boulder interview or at
17 any point during or following the investigation (Doc. #81, ¶18). It was during this termination
18 meeting that Toy mentioned for the first time that he had, in fact, disclosed the existence of
19 CRC to his former manager Solan (Doc. #81, ¶28). The decision to terminate Toy was upheld,
20 but the issue of Toy's alleged disclosure of CRC's existence was explored during a second
21 investigation, or Toy's appeal process, known as an "Open Door" investigation (Doc. #81, ¶31).
22 Following his termination, Toy's job responsibilities were assumed by 60-year-old Duane Reid
23 (Doc. #81, ¶30).
24    Mike Liddicoat conducted the "Open Door" investigation and began by interviewing
25 Solan, in July 2002, during this interview Solan stated that at the time of Toy's disclosure, he
26 did not believe CRC to be a conflict because he thought CRC was limited to residential cabling.
27 (Doc. #8, ¶35). Toy told Liddicoat that the March 11 bid to HRMC had been falsified and that
28
- 4 -

he would provide Liddicoat with documents proving the falsification; Toy failed to provide the documents and did not respond to Liddicoat's follow-up requests for the documents (Doc. #81, ¶39). Toy did not reference age discrimination as a cause of his termination at any point during the "Open Door" investigation. At the conclusion of his investigation, Liddicoat issued a report stating that Toy's termination was proper because he had failed to properly disclose CRC's commercial cabling services to management (Doc. #81, ¶41). On September 9, 2002, Toy was sent a letter formally advising him that his termination had been upheld (Doc. #81, ¶42).

Following his termination, on January 22, 2003, Toy filed a Charge of Discrimination with the EEOC, alleging that he had been terminated on the basis of age (Doc. #81, ¶43). Toy's EEOC questionnaire stated that the decision to uphold his termination was based on his age and IBM's desire to eliminate a high salary employee (Doc. #81, ¶43). The EEOC issued a Dismissal letter on February 18, 2003 (Doc. #81, ¶44).

Toy has testified that he believes his termination was based on age because his division, the IBM Printing Systems, subsequently merged with the Integrated Technology Services (ITS) Division, and his position was not backfilled (Doc. #81, ¶45). However, the actual merger was not announced until November 2002, five months after Toy's initial termination (Doc. #81, ¶50). Toy has also testified that while he worked at IBM, no one had ever referenced or commented on his age (Doc. #81, ¶56).

## SUMMARY JUDGMENT

For IBM to prevail on a motion for summary judgment, it must show that there are no genuine issues of material fact and that IBM is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The disputed facts must be material such that they "might affect the outcome of the suit under governing law." *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248, *Villodas v. Healthsouth Corporation*, 338 F. Supp.2d 1096 (D. Ariz. 2004). Summary judgment is appropriate against the party who "fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-324; *see also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994). The party moving for summary judgment does not have the burden to produce evidence showing the absence of a genuine issue of material fact on issues in which the nonmoving party bears the burden of proof, but instead may discharge its burden by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegation or denials of [the party's] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Sufficient evidence supporting the claimed genuine issue of factual dispute is required to proceed to trial to resolve the different versions of the truth. *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). If evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

The burden-shifting framework analysis of *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to cases concerning the federal Age Discrimination in Employment Act (ADEA) in determining whether or not summary judgment is appropriate. *Villodas*, 338 F. Supp. 2d at 1102 (citing *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1420 (9th Cir.1990)). To establish a *prima facie* case of age discrimination under the ADEA, *McDonnel Douglas* requires that Plaintiff shows that he was (1) more than 40 years of age at the time of the challenged employment action; (2) satisfactorily performing his/her job responsibilities; (3) discharged from employment; and (4) replaced by a substantially younger employee with equal or inferior qualifications. If Plaintiff succeeds in establishing a *prima facie* case, the burden of production shifts to Defendant employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action against Plaintiff. *Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 658 (9th Cir. 2002) (quoting *McDonnel Douglas*, 411 U.S. 792, 802 (1973)). If the employer Defendant states a legitimate nondiscriminatory reason, Plaintiff must demonstrate

that the employer's articulated reason is a pretext for unlawful discrimination by "'either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* at 658-9 (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000)) (quotation omitted). However, Plaintiff's evidence must be both specific and substantial to overcome the legitimate reasons proffered by the Defendant. *Id.* at 659. If Plaintiff demonstrates pretext, then the burden-shifting framework disappears, and the only remaining issue is "'discrimination vel non.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000)) (quotation omitted).

## DISCUSSION

**I.    TOY'S *PRIMA FACIE* CASE**

In order to establish a *prima facie* case of age discrimination under the ADEA, Toy must satisfy all the prongs of the four-part analysis by showing that he was (1) more than 40 years of age at the time of the challenged employment action; (2) satisfactorily performing his job responsibilities; (3) discharged from employment; and (4) replaced by a substantially younger employee with equal or inferior qualifications. *Villodas*, 338 F. Supp.2d at 1101 (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000). In this case, the Court finds that Toy has failed to establish a *prima facie* case with respect to the alleged age discrimination under the ADEA. The Court finds that Toy has not satisfied the fourth prong of the four-part analysis because Toy's job responsibilities were assumed by someone older than and equally qualified as himself.

Although Toy has shown membership in a protected class, being over the age of 40, that he was satisfactorily performing his job duties, and that he was discharged from employment, he did not show that he was replaced by a substantially younger employee with equal or inferior qualifications. In fact, Toy's job duties were taken over by Duane Reid, a man substantially *older* than Toy and capable of handing the job responsibilities up until the time of his own termination. Furthermore, at no time during his employment with IBM or during IBM's

investigations did Toy raise the issue of age discrimination. The Court finds that Toy has failed to establish a *prima facie* case.

## II.     THE PRETEXT ANALYSIS

Because Toy has failed to establish a *prima facie* case, the analysis could end here. However, assuming *arguendo* that Toy made a *prima facie* case, the burden then shifts to IBM to show a legitimate, nondiscriminatory reason for terminating Toy. Then Toy must demonstrate that the employer's alleged reason is pretext for another motive that is discriminatory. *Villodas*, 338 F. Supp.2d at 1096 (citing *Jurado v. Eleven-Fifty Corp.*, 338 F. Supp.2d 1406, 1409 (9th Cir. 1987), *Godwin v. Hunt Wesson Inc.*, 150 F.3d 1217, 1220 (9th Cir.1998).

In this case, IBM has proffered a legitimate, nondiscriminatory reason for terminating Toy. After two internal investigations of Toy's case, the basis of IBM's decision to terminate Toy was its reasonable belief that Toy had violated IBM's Guidelines by participating in the operation of CRC, which was found to be a competitor of IBM. Furthermore, IBM believed that Toy did not properly inform management about his involvement with CRC, as is required by the Guidelines.

The Guidelines clearly state that certain services that are "commercial" in nature are not permitted as they would create a conflict of interest with IBM's products and services. Before pursuing a planned activity that is commercial as defined by the Guidelines, the employee must consult IBM management to determine whether or not the planned activity would compete with any of IBM's actual or potential businesses. Although Toy did inform his former supervisor Solan of CRC's existence, Toy's disclosure was only informative enough to lead Solan to believe that CRC was involved only in residential cabling. Solan did not perceive that CRC would pose a conflict of interest after Toy said that CRC wired "new houses for computers" and that Toy was involved with CRC in name only. Apart from this conversation with Solan, Toy did not consult any other management representative regarding CRC.

1    IBM conducted two internal investigations of Toy's behavior. The first was an
2 investigation of CRC and Toy's involvement with CRC, and the second was an "open door"
3 investigation, or Toy's appeal process. Following the "open door" investigation, the decision
4 to terminate Toy was upheld. Toy contends that IBM's investigations were pretextual in that
5 they were designed to reach a predetermined conclusion. More specifically, Toy asserts that
6 Investigator Reed incorrectly focused his investigation on the document pertaining to the sale
7 of CISCO equipment (sent by Mr. Grosser), rather than concentrating on the facts that
8 exonerated Toy. In addition, Toy maintains that CRC was never in competition with IBM.
9 Finally, Toy asserts that his termination was age-based because his division at IBM was
10 subsequently merged with another and his position was not backfilled.

11    In response to Toy's allegations, IBM has shown that it did solicit work from HRMC
12 when Linda Toy was the Director of Information Services, and that HRMC turned down IBM
13 because it was being serviced by CRC. Toy has verified that his signature was on the CRC
14 proposal letter to HRMC, addressed to his wife Linda. During both investigations, Toy was
15 provided with the opportunity to furnish any additional documents or information but did not
16 do so. After each investigation was conducted, reports were written by Reed and Liddicoat,
17 respectively. Reed's report stated that based on the investigation, Toy was in the cabling
18 business by operating CRC, and that Toy was in direct competition with IBM, thereby violating
19 the Guidelines. Liddicoat's report stated that his investigation found that Toy had failed to
20 properly consult management about his involvement with CRC, also a violation of the
21 Guidelines.

22    Based on these investigative reports, IBM terminated Toy because it honestly and in
23 good faith believed Toy violated its rules, which applied to every employee. At no time before
24 or during the investigation did Toy raise the issue of age discrimination. After Toy's
25 termination, his job responsibilities were assumed by 60-year-old Duane Reid, and while a
26 merger of the two IBM divisions did eventually occur, one of which involved Toy's former
27 division, it was announced five months after Toy's termination. However, regardless of how

accurate the findings of the investigations are, IBM's termination of Toy is, in fact, legitimate if it "honestly believed its reasons for its actions." *Villiarimo*, 281 F.3d at 1063. The Court finds that IBM has successfully proffered a legitimate nondiscriminatory reason for terminating Toy. Toy has not provided sufficient admissible evidence to demonstrate that IBM's proffered reason is a pretext of age discrimination or any other discriminatory motive. Toy has proffered no direct evidence and the alleged circumstantial evidence is too attenuated in time.

## CONCLUSION

**IT IS THEREFORE ORDERED** that IBM's Motion for Summary Judgment is **GRANTED** (Doc. #80).

With respect to the pending counterclaim, the parties shall confer in light of the Court's rulings on the summary judgment motions and report to the Court whether a status conference needs to be set to address the status of the counterclaim.

**IT IS FURTHER ORDERED** that the parties shall file said joint report within thirty days.

DATED this 26th day of September, 2005.

_____
David K. Duncan
United States Magistrate Judge