Case 3:03-cv-00860-DKD   Document 101   Filed 09/28/05   Page 1 of 10

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Raymond K. Toy and Linda S. Toy, husband and wife,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>International Business Machines, a corporation; Dennis Grosser and Jane Doe Grosser, husband and wife,<br><br>　　　　Defendants.<br><br>International Business Machines Corporation, a corporation,<br><br>　　　　Defendant/Counterclaimant,<br><br>v.<br><br>Raymond K. Toy and Linda S. Toy, husband and wife,<br><br>　　　　Plaintiffs/Counterdefendants. | No. CIV 03-0860-PCT-DKD<br><br>**ORDER** |

Pending before this Court are Defendants'[1] separate Motions for Summary Judgment. With respect to Plaintiffs' individual claims against them, Defendants Grosser filed a Motion for Summary Judgment on January 14, 2005 (Doc. #78), and Defendant IBM filed a Motion for Summary Judgment on January 18, 2005 (Doc. #80). For the reasons stated below, the Court

---

[1] International Business Machines ("IBM"), Dennis and Donna Grosser ("Grosser").

finds there is no genuine issue of material fact, and that Defendants Grosser are entitled to judgment as a matter of law. IBM's Motion for Summary Judgment will be considered in a separate order. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) (Doc. #5).

**BACKGROUND**

Plaintiff Raymond Toy's (hereinafter "Toy") employment with Defendant IBM began on April 26, 1978 and ended upon his termination on June 5, 2002 (DSOF ¶1). Toy alleges that IBM discriminated against him on the basis of his age (age 43 at the time of termination) and thus improperly terminated his employment with IBM. (Count 1). Toy further claims that his termination was the proximate result of Defendant Dennis Grosser's (hereinafter "Grosser") intentional interference with Toy's employment contract with IBM. Toy alleges that Grosser's intentional interference occurred when Grosser contacted IBM over a matter which subsequently led to an internal investigation of Toy's conduct, and eventually resulted in Toy's termination. (Count 2).

In April 2002, Grosser, a retired IBM employee, telephoned IBM and told IBM that Toy was operating a cabling business, Colorado River Communications ("CRC") and that the business could be in competition with IBM (DSOF ¶2). Because Grosser was employed at Havasu Regional Medical Center ("HRMC") at the time, and his supervisor was Plaintiff Linda Toy, Raymond Toy's wife, Grosser asked that his name be kept confidential (DSOF ¶3). Due to poor work performance, Grosser was terminated on May 2, 2002 (PSOF ¶2).

Following Grosser's call to IBM, Tommy Reed, an IBM investigator, began an internal investigation regarding the information provided about Toy, focusing on whether or not Toy had violated section 5.12 of the Business Conduct Guidelines ("the Guidelines") (DSOF ¶4).[2] Mr.

---

[2] At the time of Plaintiff's employment with IBM, the pertinent sections of the Guidelines read, "[o]bviously, you may not commercially market products or services in competition with IBM's current or potential product offerings. Such activities are 'commercial' if you receive direct or indirect remuneration of any kind... . [It is] your responsibility to consult with your management or IBM counsel to determine whether your planned

- 2 -

Reed learned that IBM had solicited work from HRMC which declined the solicitation because HRMC was being serviced by CRC instead (DSOF ¶8-9). On May 2, 2002, Mr. Grosser sent Mr. Reed documents related to the sale of CISCO equipment and a copy of a proposal letter dated March 11, 2002; the letter was addressed to Linda Toy, HRMC's Director of Information Services, and signed by Raymond Toy, who was identified as CRC's President.

As part of his internal investigation, Reed interviewed Toy on May 14, 2002 in Boulder, Colorado; also present at the meeting was John Latimer, IBM's Manager of Security at the Boulder site (DSOF ¶14). Toy initially denied his involvement with CRC but later admitted to signing bids on behalf of CRC after Mr. Reed showed Toy a copy of a March 11, 2002 proposal letter on which Toy's signature appeared (DSOF ¶15). At this meeting, Toy stated that he had not mentioned the existence of CRC to any management representative (DSOF ¶16). Toy was told that he could provide any additional information or documents if he wished to do so, and was afforded the opportunity to ask questions before the interview concluded. IBM did not receive any additional information from Toy (DSOF ¶17). At the end of the investigation, Reed and his supervisor, Vira Brock, prepared a report based upon the information the investigation had revealed, and concluded that Toy's company CRC was in the cabling business, it was in direct competition with IBM, and Toy had thus violated the Guidelines (DSOF ¶19). Included among the documents that Grosser had sent to IBM on May 2, 2002, was a proposal letter from Toy to his wife Linda at HRMC. This proposal letter appeared to include a sheet of paper which suggests on its face that CRC was selling CISCO equipment. It is undisputed that CRC never sold CISCO equipment. Plaintiff believes the inclusion of the CISCO document bolsters his tortious interference claim to the extent that he can trace this erroneous assertion, which would not exist but for Grosser providing it to IBM, to IBM's decision to terminate Toy. Toy stated during the investigation that CRC was not involved in the sale of CISCO equipment

---

activity will compete with any of IBM's actual or potential businesses. This should be done before you pursue any activity that might create a conflict of interest with IBM."
(BCG Section 5.1.2)

- 3 -

1  and investigator Reed himself stated that although he initially believed CRC to be involved in
2  selling CISCO equipment, his investigation was more focused on CRC's commercial cabling
3  operation (DSOF ¶13, 53).  Cathy Sprague of the Human Resources Department was also
4  consulted, and after meeting with Toy's supervisors, she too concluded that termination was
5  proper based on the results of IBM's investigation, and not on the information provided by
6  Grosser (DSOF  ¶ 7, 23, Doc. #78 pg. 7, 8).

7     On June 5, 2002, Toy was told by his first-line manager Dan Crecco that he was being
8  terminated for violating the Guidelines, but that Toy could appeal the termination decision
9  (DSOF ¶26).  It was during this termination meeting that Toy mentioned for the first time that
10 he had, in fact, disclosed the existence of CRC to his former manager Mike Solan (DSOF ¶28).
11 At the end of this meeting, the decision to terminate Toy was upheld, but the issue of Toy's
12 alleged disclosure of CRC's existence was explored during a second investigation, or Toy's
13 appeal process, known as an "Open Door" investigation  (DSOF ¶31).

14    Mike Liddicoat conducted the "Open Door" investigation and began by interviewing
15 Toy's former manager, Solan, in July 2002.  During this interview Solan stated that at the time
16 of Toy's disclosure, he did not believe CRC to be a conflict because he thought CRC was
17 limited to residential cabling (DSOF ¶35).  Toy told Liddicoat that the March 11 bid to HRMC
18 had been falsified and that he would provide Liddicoat with documents proving the falsification;
19 Toy failed to provide the documents and did not respond to Liddicoat's follow-up requests for
20 the documents (DSOF ¶39).  At the conclusion of his investigation, Liddicoat issued a report
21 stating that Toy's termination was proper because Toy had failed to properly disclose CRC's
22 commercial cabling services to management (DSOF ¶41).  On September 9, 2002, Toy was sent
23 a letter formally advising him that his termination had been upheld (DSOF ¶42).

24                                    **SUMMARY JUDGMENT**

25    For Grosser to prevail on a motion for summary judgment, he must show that there are
26 no genuine issues of material fact and that he is entitled to judgment as a matter of law.
27 Fed.R.Civ.P. 56(c).  The disputed facts must be material such that they "might affect the
28
                                                 - 4 -

outcome of the suit under governing law... ." *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248; *Villodas v. Healthsouth Corporation*, 388 F. Supp.2d 1096 (D. Ariz. 2004). Summary judgment is appropriate against the party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-324; *see also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994). The party moving for summary judgment does not have the burden to produce evidence showing the absence of a genuine issue of material fact on issues in which the nonmoving party bears the burden of proof, but instead may discharge its burden by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegation or denials of [the party's] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Sufficient evidence supporting the claimed genuine issue of factual dispute is required to proceed to trial to resolve the different versions of the truth. *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). If evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## DISCUSSION

**I.      INTENTIONAL INTERFERENCE WITH A CONTRACT BY A THIRD PARTY.**

Toy alleges that third-party Grosser was aware of Toy's employment contract with IBM, and that Grosser wilfully and intentionally interfered with the contractual relationship. Toy further asserts that Grosser's purpose in interfering was unjustified and that this caused or contributed to Toy's termination and loss of income. Toy maintains that Grosser contacted IBM knowing that doing so would create a substantial risk that Toy would lose his job or a source of income. Toy believes that under these circumstances, punitive damages as well as

- 5 -

compensatory and general damages are appropriate. Grosser argues that Toy is unable to establish the critical elements of improper motive or causation with respect to an intentional interference claim.

A person who intentionally and improperly interferes with a contract between a party and a third person by inducing or otherwise causing the third person not to conform to the contract is subject to liability to the other. *Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 388 (1985) (citing Restatement (Second) of Torts §766), *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 427 (Ariz. App.1995). In order to establish tortious interference with a contractual relationship, five elements must be proven. First, the plaintiff must prove the existence of a valid contractual relationship. Second, it must be shown that the defendant had knowledge of the contract. Third, intentional interference by the defendant must be shown to have induced or caused a breach or termination of the contract. Fourth, the defendant must have acted improperly. And fifth, the resulting damages to the plaintiff must be shown. *Id.* at 386 (citing *Antwerp Diamond Exchange of America, Inc. v. Better Bus. Bur.*, 130 Ariz. 523, 530 (1981)), *Pasco v. Talco Recycling, Inc.*, 195 Ariz. 50, 62 (1999), *Barrow v. Arizona Board of Regents*, 158 Ariz. 71, 78 (Ariz. App. 1988). Grosser argues that Toy failed to establish the third and forth elements: that the information Grosser provided caused IBM to terminate his employment, and that Grosser's actions were improper.

### A.   CAUSATION OF BREACH

Grosser argues that he did not cause Toy's termination but merely served as a starting point for IBM's investigation. Grosser asserts that it was IBM's actual investigation that caused the termination rather than his alerting IBM and providing a starting point for the investigation (Doc. #78 pg. 6). In support, he offers the affidavit of Cathy Sprague of Human Resources, where she states that it was IBM's decision to terminate Toy based on the results of IBM's investigation and not on the information that Grosser provided.

Toy asserts that for legal liability to attach with respect to causation in this case, Grosser's action must only be *a* cause and not *the* cause of the breach (Doc. #85 pg. 7, 8). For

1  this reason, Toy asserts that he has proven the causation element by virtue of Grosser being
2  responsible for contacting IBM, which then led to the investigation that ultimately resulted in
3  Toy's termination.  Grosser, in turn, counters that Toy misconstrues the proximate cause
4  requirement for legal liability and maintains that under Arizona law, proof of proximate cause
5  is necessary and merely asserting that Grosser was *a* cause is not enough to meet the burden as
6  proximate cause must be the natural continuous sequence of events, unbroken by any
7  intervening cause (Doc. #95 pg. 4, 5), citing *Saucedo v. Salvation Army*, 200 Ariz. 179, 183, 24
8  P.3d 1274, 1278 (App. 2001).

9        Specifically, Grosser argues that IBM did not rely on his disclosure to make its decision,
10 but that it relied on the results of the investigation instead.  Grosser further asserts that in spite
11 of Toy's allegations that Grosser mislead IBM by including an unrelated document in his
12 disclosure, the primary focus of IBM's investigation was on Toy's company, CRC, and not on
13 the sale of CISCO equipment.  To support his position, Grosser relies on investigator Reed's
14 statement that IBM was more concerned with CRC's operation of commercial cabling than it
15 was with CRC's relation to CISCO equipment.  For these reasons, Grosser maintains that the
16 causation requirement has not been demonstrated because his actions are not closely connected
17 enough to IBM's breach of its contract with Toy.

18       There is nothing in the record showing that there was any reason to be suspicious of Toy
19 and his conduct prior to Grosser's telephone call to Reed.  In fact, Toy's managers at IBM were
20 disappointed to learn of Toy's situation involving termination because he had been such an
21 excellent employee.  While Grosser maintains that IBM's investigation did not focus on the
22 unrelated CISCO document and that this document played no part in IBM's decision to
23 terminate Toy, Liddicoat's final report is less clear.  After conducting the "open door"
24 investigation, Liddicoat wrote in his report that CRC's bids to HRMC "involved network
25 cabling services and CISCO hardware. [This] is a direct conflict with IBM services team. IBM
26 is in the business of selling cabling services and most importantly, reselling CISCO hardware"
27 (Doc. #88, Exhibit C, pg. 4).  Thus, this written statement by Liddicoat is contrary to what
28

- 7 -

1 Grosser and IBM claimed when asserting that the document related to the sale of CISCO
2 equipment had no bearing in the decision to terminate Toy. Based on Mr. Liddicoat's report,
3 it would appear that IBM might have considered the CISCO document and used it as proof of
4 a "conflict of interest."

5 Assuming *arguendo* that Liddicoat's statement accurately reflects IBM's focus during
6 the investigation, Toy is unable to show that Grosser was the proximate cause of his
7 termination. It is not enough that Grosser merely alerted IBM of Toy's involvement with CRC
8 and sent documents unfavorable to Toy, or even that Grosser included an erroneous document
9 that made it appear that Toy's violation of the Guidelines was more threatening. Toy was
10 terminated after two thorough investigations were conducted, and after various supervisors,
11 managers, and personnel had met and discussed the situation. The legal cause of Toy's
12 termination was the fact that he had violated the company's guidelines – an independent
13 conclusion which IBM's internal investigations reached after considerable process and
14 independent deliberation and fact-finding. The Court finds that Toy has failed to show that
15 Grosser's interference was the proximate cause of his termination.

### B.   ACTIONS BASED ON IMPROPER MOTIVE

17 To prove liability on the part of Grosser, Toy must also show that Grosser's actions were
18 improper as to motive or means. *Wagenseller*, 147 Ariz. at 388. If the interference creates
19 liability, the liability must be based on more than the act of the interference alone. *Id.* To
20 determine whether a particular action is improper, seven factors are considered: 1) the nature
21 of the actor's conduct, 2) the actor's motive, 3) the interests of the other with which the actor's
22 conduct interferes, 4) the interests sought to be advanced by the actor, 5) the social interests in
23 protecting the freedom of action of the actor and the contractual interests of the other, 6) the
24 proximity or remoteness of the actor's conduct to the interference, and 7) the relations between
25 the parties. *Id.* at 387 (citing Restatement (Second) of Torts §767).

26 Toy asserts that Grosser's actions showed improper motive, the second factor of the
27 *Wagenseller* test. Toy argues that Grosser's motive was improper because Grosser contacted

- 8 -

IBM with information about CRC because he knew his own job at HRMC was at risk. In short, Toy argues that Grosser's motive was improper because his actions were committed in anticipatory retaliation for his impending termination from HRMC. Toy believes Grosser knew of his upcoming termination because of a Corrective Action Plan that was issued on April 17, 2002; Grosser was terminated on May 2, 2002. Toy also claims that Grosser's motive was improper because among the documents that Grosser faxed to Reed was the document related to CISCO equipment which was completely unrelated to the other documents. Toy asserts that Grosser's actions were improper because Grosser waited to contact IBM only when he thought his own job was in jeopardy, and then deliberately included the unrelated CISCO document in order to mislead IBM that there would be a conflict of interest between CRC and IBM's own services.

In response, Grosser asserts that Toy has failed to mention the remaining six factors of the *Wagenseller* standard, thus conceding that there are no other factors demonstrative of Grosser's improper actions other than improper motive. Grosser claims that Toy's theory of retaliation with regard to his improper motive is flawed because Grosser was not terminated from HRMC until *after* he had contacted IBM about Toy's cabling business. Thus, even though Toy argues that Grosser knew of his impending termination due to the Corrective Action Plan issued on April 17, 2002, Grosser contends that he did not believe the Plan would result in his termination, because he had never before received any written warnings of unprofessional behavior by his supervisor Linda Toy prior to April 17, 2002. In spite of the Corrective Action plan, Grosser maintains he was unconcerned about termination because prior to the issuance of the Plan he had received a positive evaluation by Linda Toy. As a result, Grosser maintains that because he had no way of anticipating his termination, and because he was fired after having alerted IBM about CRC, his actions were not retaliatory and his motive not improper. The Court is hesitant to resolve issues of motive on summary judgment and will decline to do so. Grosser is a retired, long-term IBM employee, who claims that he informed IBM about CRC out of loyalty to his former employer, which is entirely plausible. On the other hand, the

1  context of Grosser's deteriorating employment situation suggest the plausibility of an ill-motive.
2  Such issues are best left to the trier of fact.  Thus, the Court finds that an issue of material fact
3  precludes summary judgment as to motive.

4       Notwithstanding the issue of fact on this element, Toy is unable to establish the causation
5  element of a claim for tortious interference with a contractual relationship and, accordingly,

6       **IT IS HEREBY ORDERED** Defendants Grossers' Motion for Summary Judgment is
7  **GRANTED** (Doc. #78).

8       DATED this 26th day of September, 2005.

_____
David K. Duncan
United States Magistrate Judge

- 10 -